**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **MARY JENKINS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:15-cv-0744** |
| | ) | **Judge Aleta A. Trauger** |
| **ELECTROLUX HOME PRODUCTS, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Plaintiff Mary Jenkins filed this action in July 2015, asserting claims of age and disability discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.*, and the Tennessee Disability Act ("TDA"), Tenn. Code Ann. §§ 8-50-103 and -104. Now before the court is the defendant's Motion for Summary Judgment. (Doc. No. 29.) The motion has been fully briefed and is ripe for review. For the reasons set forth herein, the court will grant the motion and dismiss this action with prejudice.

## I.    MATERIAL FACTS[1]

Defendant Electrolux Home Products, Inc. ("Electrolux") manufactures gas and electric ranges at a factory in Springfield, Tennessee. Plaintiff Mary Jenkins, a 67-year-old woman, began working at Electrolux's Springfield facility in 1978. At the time of her termination on

---

[1] The facts set forth herein are, for the most part, drawn directly from the plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Doc. No. 36-1) and are undisputed for purposes of the Motion for Summary Judgment, unless otherwise indicated.

September 5, 2014, Jenkins was a Customer Service Advocate ("CSA") in Electrolux's Direct Ship Department and had held that position for several years.

Among other things, CSAs' responsibilities generally include handling customer orders, tracking orders to ensure timely shipment, printing bills of lading, and communicating with customers about the status of their orders. As a CSA, Jenkins specifically handled intercompany orders, known as employee sales or "IC orders." IC orders include employee purchases of Electrolux products as consumers and orders of products by Electrolux engineers for testing. In addition to tracking IC orders, Jenkins also printed bills of lading, tracked scrap units, and did some filing work. All CSAs were expected to share responsibility for ensuring overall customer satisfaction and to serve as backup for each other as needed.

In June 2013, Megan Stanton became the Demand Flow Manager in the Direct Ship Department; in January 2014, Stanton became the CSAs' direct supervisor. Stanton's supervisor was J.T. Terzo, the Demand Flow and Distribution Manager.

When Stanton joined the Direct Ship Department in June 2013, there was a corporate computer system, known as Focus, that showed orders nationwide but provided few details on particular orders. There was no uniform, centralized order tracking system at the Springfield plant. Instead, each CSA at the Springfield plant managed and tracked orders using his or her own individual method or system. At that time, errors were being made with respect to external and IC orders in the Direct Ship Department: some external and IC orders were not being shipped in a timely fashion; some incorrectly appeared as "past due" in Focus even when they were not; other orders went missing altogether or were duplicated. These errors drove costs up substantially. The individual tracking methods also made it difficult for any CSA to locate or track another CSA's orders when they were called in to perform back-up for one another.

Likewise, the individual systems made it difficult for management to locate an order or quickly provide customer assistance if needed.

Stanton communicated the Direct Ship Department's order tracking issues to Trina Phillips, a corporate CSA Manager. To improve the Direct Ship Department's efficiency in order tracking, Phillips created a "dashboard" for the Springfield plant—a shared excel file stored in the public folder of the plant's intranet that shows all past-due orders and the specific circumstances underlying the past-due status. The dashboard provides a centralized source for up-to-date information on any past-due order, including its daily location and status, accessible to anyone in the plant who needs the information. In the fall of 2013, Phillips came to the plant and trained the Direct Ship Department on how to use the dashboard. Jenkins was present during the training.

In October 2013, Stanton noticed that many of Jenkins' orders were not up to date. For example, orders that had been complete since June 2013 had not been updated to reflect this status and thus appeared as past-due in Focus. At the time, Jenkins was still keeping track of her orders through handwritten notes on pieces of paper or post-it notes that she kept in a folder at her desk. On October 28 and 29, 2013, Stanton asked Jenkins to update her past-due orders by November 1, 2013.

Jenkins concedes that she did not have all of her past-due orders current by November 1. She explained: "I did most of them, but there were certain ones that I did not have any ranges for, and so there was no way that I could do them if I did not have a range and a serial number." (Doc. No. 30-2, Pl.'s Dep. at 52.)[2] Stanton asked her again on November 1 and November 5 to

_____

[2] It is unclear whether the plaintiff understood Stanton's request as requiring her to ensure that the past-due orders were shipped and therefore no longer past-due, or to ensure that the paperwork related to the past-due orders was up to date.

update her past-due orders; on November 5, Stanton gave Jenkins a list detailing which orders needed to be brought current and removed from Focus. As of November 6, Jenkins still had not updated all of the orders. She received a written warning related to this event on November 6, 2013, notifying her that she was underperforming and specifically directing her to "keep [her] orders current" and also to keep up with the other tasks she was expected to perform. (Doc. No. 30-5, at 1.)

As early as June 2013, Terzo had noticed significant discrepancies in the financials on scrap units, including between the reported scrap figures and the actual figures. He learned that Jenkins was responsible for reporting the scrap numbers and discovered that she was not regularly reporting up-to-date numbers, which he concluded was causing many of the discrepancies. (Doc. No. 30-1, Terzo Decl. ¶ 5.) The November 6 written warning also specifically notified Jenkins that she needed to keep her scrap reporting current. (Doc. No. 30-5, at 1.)

Jenkins received an overall rating of "underperforming" on her 2013 Annual Performance Appraisal ("APR"). The APR identified areas in which Jenkins needed to improve, including IC order tracking, use of the dashboard, and the quality of her written communications. Stanton and Jenkins met to review the APR on April 30, 2014. In response to the APR's evaluation of her use of the dashboard, Jenkins told Stanton that she had never been specifically told to use the dashboard and that it was not part of her job. Stanton explained that, going forward, Jenkins was expected to keep track of her orders in the dashboard, to improve her IC order tracking overall, and to learn to use the dashboard. Shortly after that, Stanton sat with Jenkins for about an hour, showing her how to use the dashboard, while Jenkins took notes. (Pl.'s Dep. at 36.)

A month after meeting with Stanton to discuss her APR, Jenkins was still not using the dashboard. As a result, on May 30, 2014, Terzo and Stanton placed her on a 90-day Performance Improvement Plan ("PIP"). The PIP identified three critical areas where improvement was needed: "[m]anagement and completion of daily dashboard"; "[m]anagement and follow up with customer orders and requests for information"; and "[o]wnership of printing bills [of lading] accurately and timely and process bills in appropriate order date." (Doc. No. 30-7.) The PIP laid out specific steps that Jenkins was to take in order to improve in these areas and notified her that she was expected to "make immediate progress toward meeting these requirements." (*Id.*) Jenkins signed the summary of her May 30 performance discussion with Stanton, but testified that she signed only to indicate that the PIP was discussed with her, not that she agreed with it, and that she "just felt . . . it wasn't necessary." (Pl.'s Dep. at 55.)

During the 90-day PIP period, Jenkins and Stanton met weekly to review Jenkins' progress, identify areas where improvement was still needed, discuss ways to help Jenkins improve, and set weekly objectives. By the end of the first month, it was Stanton's perception that Jenkins was still not using the dashboard or the open-orders file as instructed. (*See* Doc. No. 30-10, July 11, 2014 Memo titled "Review and feedback after a month of meetings.") Jenkins signed Stanton's assessment but noted that her signature acknowledged only that they had discussed the memo, not that she agreed with Stanton's feedback. (*Id.*; Pl.'s Dep. at 78.) Jenkins testified that she disagreed with several of the statements in the memo. (Pl.'s Dep. at 72–77.)

Jenkins conceded that she did not send daily updates to the dashboard to Stanton as instructed if there were no changes to it: "If there was no change to the Dashboard, I did not send it to her every day." (Pl.'s Dep. at 77.) Jenkins felt that Stanton could access that information herself, so there was no need to send it to her. (*Id.* at 78.)

Despite being admonished in the April APR to improve the quality of her emails and later receiving an additional written reminder in June from Stanton and Terzo to double-check and proofread her emails before sending them, Jenkins continued to send emails with many errors. Jenkins does not dispute that her emails contained errors, but she insists that she did not make any more mistakes than her colleagues and supervisors, including Stanton. In support of that statement, however, Jenkins points only to her own notes on her copy of Stanton's July 11, 2014 memorandum, identifying perceived errors. (*See* Pl.'s Dep. at 69; Doc. No. 30-12.) In any event, despite the reminder in June, Jenkins continued to send emails with errors throughout the summer of 2014. (Doc. No. 30-14.) In addition, Jenkins was still not keeping the scrap records up to date.

In July 2014, Stanton and Terzo amended the PIP to include specific directives that Jenkins improve the "quality of her written communication" and the "tracking and communication of scrap quantity and cost." (Doc. No. 30-15, PIP Amendment.) Regarding scrap, the amended PIP required Jenkins to "track the quantity of scrapped units weekly and the associated cost and send to JT Terzo every Monday. A month to date total should be included with the data." (*Id.*) Nonetheless, for several weeks after the PIP was amended, Jenkins sent the scrap updates late, sent incomplete information, or failed to send any update at all. After again being reminded by Terzo to send the scrap information, including the month-to-date total as required by the PIP amendment, Jenkins told Terzo that she had not been sending the month-to-date data because that requirement "ha[d] not been discussed." (Doc. No. 30-18, at 2.)

During the 90-day PIP period, despite being specifically directed to do so in the PIP, Jenkins did not properly refresh and update the dashboard on a daily basis. (Pl.'s Dep. at 59.) She did not always escalate open orders that would become past-due to the manager ahead of time,

and she did not always report daily on all orders that were past due. (*Id.* at 60.) In addition, Jenkins continued to send emails with numerous spelling and grammatical errors. Jenkins does not dispute that fact, but she maintains that others, including Stanton, had just as many errors in their emails and that it was hypocritical for Stanton to demand better email etiquette from Jenkins when her own communications contained errors. (Doc. No. 36-1, at ¶¶ 67, 69.)

Jenkins does not dispute that she understood both the dashboard and open order files from early on during the PIP period. She understood what was expected of her as to the scrap report and the quality of her emails.

After the PIP Amendment went into effect, Terzo sat in on the meetings with Jenkins on August 8, 15, and 22. According to Terzo, at each meeting he asked Jenkins how they could help her improve and achieve the PIP goals, but she did not respond meaningfully. Terzo concluded that the meetings were not serving any purpose, as Jenkins had not meaningfully improved or complied with the performance requirements.

Following the August 8 meeting, Terzo sent an email to Human Resources ("HR") Director Mike Norton and HR Manager Jeri King, recommending that Jenkins be terminated unless HR could transfer her to an alternative position within the plant. (Doc. No. 30-20, Aug. 8, 2014 email). At the August 15, 2014 PIP meeting, Terzo asked Jenkins if she would be interested in transferring to a position in another department, either HR or the product testing lab. Jenkins rejected the offer without asking what specific jobs might be available in those departments. According to Jenkins, she told Terzo that she was not qualified for a job in HR or the testing lab, and that going "back to the line would be a demotion." (Pl.'s Dep. at 98.)

On September 5, Electrolux terminated Jenkins' employment based on performance issues. She was told that she was no longer able to do her job and was not interested in taking

another job within the company, so there was no choice but to terminate her. (Pl.'s Dep. at 100–01.)

After Jenkins' termination, Electrolux did not replace her with another CSA. Instead, Stanton divided Jenkins' duties among the current CSAs in the Direct Ship Department and also took on some of the duties herself.

On July 30, 2014, while the PIP period was ongoing, Jenkins filed her first EEOC charge, alleging age discrimination. The EEOC Regional Director signed the Notice of Charge and mailed it to Electrolux on August 7, 2014. Electrolux's Human Resources Manager received the charge on August 11 and forwarded it to the company's general counsel. Jenkins filed her second EEOC charge on September 18, 2014.

She filed this lawsuit on July 2, 2015.

## III. LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment on a particular claim by an adverse party, the moving defendant must show that there is no genuine issue of material fact as to at least one essential element of that claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## IV.    ANALYSIS

In her Complaint, Jenkins asserts that (1) Electrolux discriminated against her based on age, in violation of the ADEA and THRA; (2) Electrolux retaliated against Jenkins for filing her July EEOC charge, in violation of the ADEA; (3) Electrolux fired her because it regarded her as disabled due to her age, in violation of the TDA; and (4) Electrolux fired her in violation of the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304, and the Tennessee Occupational Safety and Health Act ("TOSHA"), Tenn. Code Ann. § 50-3-409.[3]

Electrolux moves for summary judgment of all claims against it. In response, Jenkins expressly concedes her TPPA and TOSHA claims but insists that material factual disputes preclude summary judgment on her remaining claims.

### A.    Age Discrimination under the ADEA and THRA

The requirements for establishing an age discrimination claim under the THRA are the same as under the ADEA. *Scola v. Publix Supermarkets, Inc.*, 557 F. App'x 458, 465 (6th Cir. 2014) (citations omitted). Both statutory schemes prohibit employers from discriminating against employees because of age. 29 U.S.C. § 623(a); Tenn. Code Ann. § 4-21-401(a). A plaintiff may

---

[3] The Complaint also alleged sex discrimination in violation of the THRA, but that claim was dismissed by stipulation. (Doc. No. 26.)

prove age discrimination in violation of either statute by relying on direct or circumstantial evidence. A plaintiff relying on circumstantial evidence must satisfy the requirements of the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), by first making out a *prima facie* case of discrimination. If she is successful, the burden then shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason' for the termination." *Scola v. Publix Supermarkets, Inc.*, 557 F. App'x 458, 463 (6th Cir. 2014) (quoting *McDonnell Douglas*, 411 U.S. at 802). The burden then shifts back to the employee to prove that the employer's justification is pretext for discrimination. *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014). The employee must ultimately show that "age was the 'but-for' cause of the employer's adverse action." *Id.* (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)).

A plaintiff can establish a *prima facie* case of age discrimination by showing that "(1) she was at least 40 years old at the time of the alleged discrimination; (2) she was subjected to an adverse employment action; (3) she was otherwise qualified for the position; and (4) she was replaced by a younger worker, or there are circumstances that support an inference of discrimination." *Moffat v. Wal-Mart Stores, Inc.*, 624 F. App'x 341, 346 (6th Cir. 2015) (citations omitted); *see also Blizzard v. Marion Technical Coll.*, 698 F.3d 275, 283 (6th Cir. 2012).

Electrolux does not dispute that Jenkins belongs to a protected class for purposes of an age discrimination claim. And, while it argues that only one of the employment actions about which Jenkins complains is sufficiently adverse to satisfy the second element, it concedes that

termination satisfies the second element.[4] Electrolux moves for summary judgment on the age discrimination claims on the basis that Jenkins cannot establish the third or fourth elements of the *prima facie* case and, alternatively, that Jenkins cannot show that Electrolux's legitimate, non-discriminatory reason for firing her is pretextual. As discussed below, the court is persuaded by Electrolux's arguments.

### (1)    Qualification for the Position

Generally, to prove the third element, a plaintiff must only demonstrate that she was objectively qualified for the position by presenting credible evidence that her qualifications "are at least equivalent to the minimum objective criteria for employment in the relevant field." *Wexler v. White's Fine Furniture*, 317 F.3d 564, 575–76 (6th Cir. 2003). The court should consider the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills. *Id.* at 576. The court is to examine this evidence "independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating [the] plaintiff." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000).

Electrolux points to the Sixth Circuit's decision in *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990), holding that the employee who admitted he was not meeting his employer's legitimate expectations could not show that he was "qualified":

> In order to show that he was qualified, McDonald must prove that he was performing his job at a level which met his employer's legitimate expectations. Moreover, [i]f [McDonald] was not doing what his employer wanted him to do, he was not doing his job. . . . [McDonald] does not raise a material issue of fact on the question of the quality of his work merely by challenging the judgment of his

---

[4]    Jenkins also claims that Electrolux took adverse actions against her because of her age, in violation of the ADEA and THRA, when Stanton excluded Jenkins from instructions and discussions, forced her to train her own replacement, and put her on the PIP.

> supervisors. In this case, McDonald does not dispute, but in fact acknowledges that his supervisors were dissatisfied with his job performance in the summer of 1986 when he was discharged. Instead McDonald argues that Union Camp made too big a deal out of his alleged "people problems." However, the aim is not to review bad business decisions, or question the soundness of an employer's judgment. McDonald was simply not performing to Union Camp's satisfaction. Since McDonald concedes this point, there remains no genuine issue of material fact as to whether he was qualified.

*Id.* (internal quotation marks and citations omitted). In *Wexler*, the court again confirmed that it is generally not appropriate to consider the defendant-employer's proffered non-discriminatory reason for an employment action in determining whether the plaintiff stated a *prima facie* case of discrimination. *Wexler*, 317 F.3d at 575. The court distinguished *McDonald* on the basis that McDonald conceded that he was not performing his job duties at a level that met his employer's legitimate expectations.

Here, in response to the defendant's motion, Jenkins "contends that she was qualified for her position," but she does not offer argument or evidentiary support for that contention other than claiming that she worked for fifteen years as a CSA and "did not start having trouble" until Stanton became her supervisor. (Doc. No. 36, at 5) She claims she did not receive adequate training; she was ridiculed "day in and day out" and told that she could no longer do the job. (*Id.*)

Jenkins, however, does not dispute that she was told on April 30, 2014 that she was expected to use the dashboard going forward (Doc. No. 36-1, at ¶ 41); she still was not using the dashboard a month later (*id.* at ¶ 43); she was placed on the PIP on May 30, 2014 (*id.* at ¶ 44); by the end of June, Jenkins was not sending daily dashboard updates or open orders to Stanton as instructed, because she felt that Stanton could access that information herself (*id.* at ¶ 57); she did not always escalate open orders that would become past-due to the manager ahead of time, and she did not always report daily on all orders that were past due ((Pl.'s Dep. at 59, 60); she continued to send emails, including customer emails, with spelling and grammatical errors (Doc.

No. 36-1, at ¶¶ 58, 59, 67); despite the November 2013 written warning instructing Jenkins to keep the scrap records current, the discrepancies in financials from out-of-date records continued (*id.* at ¶ 60); the following summer, although the PIP amendment made clear that Jenkins "must track the quantity of scrap units weekly and the associated cost and send to JT Terzo every Monday" (Doc. No. 30-15), and Terzo set an automatic weekly calendar reminder to that effect, for several weeks after the amendment, Jenkins sent the scrap updates late, sent incomplete information, or failed to send any update at all (Doc. No. 36-1, at ¶ 66); over a month after the PIP amendment, which instructed that "a month to date total should be included with the [scrap] data" (Doc. No. 30-15), Jenkins told Terzo that she had not been sending the data because that requirement "ha[d] not been discussed" (Doc. No. 36-1, at ¶ 72). And finally, Jenkins admits that she did not complete the PIP performance requirements to Electrolux's satisfaction. (Resp. to Statement of Undisp. Facts ¶ 82; Pl.'s Dep. at 97 ("I mean, according to them, I was not.").)

Electrolux established clear expectations in Jenkins' April 2014 APR, the PIP, the PIP amendment, and the weekly PIP meetings: (1) update the daily dashboard and open orders files, and send Stanton daily reports on the files; (2) send Terzo a scrap report every Monday with the weekly and month-to-date scrap figures; and (3) reduce the amount of errors in emails to improve the quality of her written communications. Jenkins does not refute the reasonableness of these expectations and concedes that she did not meet them. Under the circumstances, the court finds that she has failed to show that she remained qualified for the job she held or that there is a genuine factual dispute in that regard.

### (2)     *Circumstances That Support an Inference of Discrimination*

Moreover, Jenkins also cannot satisfy the fourth element of her *prima facie* case, which requires showing that Electrolux replaced her with someone significantly younger or presenting

other circumstances that support an inference of discrimination. *Moffat*, 624 F. App'x at 346; *Blizzard*, 698 F.3d at 283. An employee is not considered to be replaced when her duties are absorbed by another person or when the work is redistributed among other existing employees already performing related work. *Geiger v. Tower Automotive*, 579 F.3d 614, 620-623 (6th Cir. 2009); *see also Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 537 (6th Cir. 2014) ("[W]e have consistently found that a 'plaintiff's job was simply eliminated' when the plaintiff's former duties were assumed by a younger employee, who performed them in addition to his other functions.").

In her Response to Electrolux's Statement of Undisputed Facts, Jenkins concedes that, after her termination, Electrolux did not replace her with another CSA and instead divided her duties among current CSAs and Stanton. (Doc. No. 36-1, at ¶ 84.) In her Response in Opposition to the Motion for Summary Judgment, she contends, wholly without support from the record, that she was replaced by a younger individual. (Doc. No. 36, at 5.) The court finds as a matter of undisputed fact that Jenkins was not replaced by a younger employee.

The other circumstances to which Jenkins points in support of her age discrimination claim are that she was 67 years old, had been with Electrolux for 36 years, and had no trouble at all until Stanton became her supervisor. After that, Stanton and Terzo "treated her differently and made her feel as if she was being discriminated against because of her age." (*Id.* at 6 (citing Pl.'s Dep. at 107.) Jenkins "felt that she was constantly being put down by supervisors who were not intent on helping her but instead driven to terminate her employment because of her age." (Doc. No. 36, at 6.) However, "mere personal beliefs, conjecture and speculation" do not support an inference of age discrimination. *Wexler*, 317 F.3d at 584.

Jenkins also argues that she did not receive adequate training on the dashboard. The

record reflects that she never complained about not receiving adequate training and instead asserted that she understood what was expected of her. (Doc. No. 36-1, at ¶ 69.) Further, Jenkins has not presented any evidence that she was treated disparately from other, younger employees. In fact, she has presented no evidence at all regarding the ages of the other CSAs or suggesting that her supervisors' treatment of her was related to her age.

In short, the plaintiff was not replaced at all, and she has not pointed to "other circumstances" in the record that support an inference of discrimination. For this reason too, Electrolux is entitled to summary judgment.

### *(3)* *Pretext*

Even assuming that the plaintiff established a *prima facie* claim of age discrimination, she has not refuted Electrolux's legitimate, non-discriminatory reason for discharging her: failure to meet Electrolux's expectations of improvement under the PIP.

To establish pretext, Jenkins must show that Electrolux's stated reason for firing her was pretextual and that retaliation was the true motive. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 547 (6th Cir. 2008). The plaintiff can meet this burden by showing that: (1) the defendant's stated reason for terminating her has no basis in fact, (2) the stated reason was not the actual reason, or (3) the stated reason was insufficient to explain the defendant's action. *Id.* at 545 (citation omitted). "Once a plaintiff establishes [her] *prima facie* case, this, along with disbelief of the defendant's proffered reasons for the negative employment action, will permit a finding of discrimination by the factfinder." *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 347 (6th Cir. 1997) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, (1993)).

Electrolux's proffered reason for firing Jenkins is that she did not comply with the PIP. To show that this reason is factually false, a plaintiff "must put forth 'evidence that the proffered

bases for the plaintiff's discharge never happened." *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 502 (6th Cir. 2007) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Geiger v. Tower Auto.*, 579 F.3d 614 (6th Cir. 2009)). As discussed above, Jenkins cannot show that Electrolux's reason was factually false because she admitted that she did not meet the PIP. Specifically, she admitted that, during the 90-day PIP period, despite being specifically directed to do so in the PIP, she did not properly refresh and update the dashboard on a daily basis (Pl.'s Dep. at 59); she did not always escalate open orders that would become past-due to the manager ahead of time (*id.* at 60); she did not always report daily on all orders that were past due (*id.*); she continued to send the scrap updates late, or send incomplete information, or failed to send any update at all; and she continued to send emails with numerous spelling and grammatical errors. (Doc. No. 36-1, at ¶¶ 66, 71–73.)

To show that it 'was more likely than not" that Electrolux terminated her based on an illegal motivation, Jenkins must show "that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Abdulnour*, 502 F.3d at 503 (quoting *Manzer*, 29 F.3d at 1084). Aside from the plaintiff's age and her speculation as to the cause of her termination, the record is devoid of circumstantial evidence supporting her claim.

And finally, for purposes of showing that her performance issues were not sufficient to warrant termination, Jenkins has not presented evidence of other employees with her same performance issues who were not disciplined or terminated; nor does she have evidence to support a conclusion that her performance did not justify termination. Although she alleges that the errors in her emails were no more egregious than those in other employees' and even her

supervisors' emails, she offers nothing but her own belief to support such a statement. And she does not refute Electrolux's allegations that none of the other CSAs had similar difficulties adjusting to the new technology and system.

In sum, the plaintiff's age discrimination claims fail because the plaintiff has not established a *prima facie* case of discrimination: she has not shown that she was qualified for her position; she was not replaced by a younger employee; and she fails to present evidence of any other circumstances justifying an inference of discrimination. Even if she could establish a *prima facie* case, she has not shown that the defendant's legitimate, non-discriminatory reason for the employment action was pretextual. The defendant is entitled to summary judgment on this claim.

### B.      Disability Discrimination under the TDA

Jenkins asserts that Electrolux fired her because it regarded her as disabled due to her age, in violation of the Tennessee Disability Act ("TDA"), Tenn. Code Ann. §§ 8-50-103 and 8-50-104.

To state a claim for discrimination under the TDA, a claimant must show (1) that she was qualified for the position; (2) that she was disabled; and (3) that she suffered an adverse employment action because of that disability. *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 705 (Tenn. 2000); *Bennett v. Nissan N. Am., Inc.*, 315 S.W.3d 832, 841 (Tenn. Ct. App. 2009); Tenn. Code Ann. § 4-21-102(3)(A). Notably, unlike its federal analog, the TDA does not include a "reasonable accommodation" component. *Bennett*, 315 S.W.3d at 841. And the plaintiff must show that she suffered discrimination based "solely" upon her disability. Tenn. Code Ann. § 8-50-103(b).

Tennessee courts recognize that the "threshold issue" for a plaintiff asserting a TDA violation is whether the claimant is "disabled." *Barnes*, 48 S.W.3d at 709–10; *Bennett*, 315

S.W.3d at 841. Although the TDA does not define the term "disabled," the definition contained in the Tennessee Human Rights Act ("THRA") is applicable to TDA claims. *Barnes*, 48 S.W.3d at 706 (citation omitted). The THRA defines disability as:

(i) A physical or mental impairment that substantially limits one (1) or more of [a] person's major life activities;

(ii) A record of having such an impairment; or

(iii) Being regarded as having such an impairment . . . .

Tenn. Code Ann. § 4-21-102(3)(A).

Here, the sole "disability" Jenkins identifies is her age. Specifically, she alleges that Electrolux "regarded" her as disabled because of her age. (Compl. ¶ 44.) However, other than comments from two co-workers who told her she was too old to work and ought to retire, which she never reported to management (Pl.'s Dep. at 120–21), Jenkins had no reason to believe that anyone at Electrolux perceived her as disabled. (*See id.* at 120 ("Q. Did you ever talk about a disability with anybody at Electrolux? A. No. Q. Did anybody at Electrolux ever treat you like you were disabled? A. No, I don't think so.").) In short, the plaintiff offers no evidence to suggest that she was "regarded" as disabled other than her own speculation and conjecture which, as set forth above, do not support an inference of discrimination. *Wexler*, 317 F.3d at 584 (6th Cir. 2003). Because she was not disabled or regarded as disabled, she cannot establish discrimination on the basis of disability. Moreover, it is clear that the disability discrimination claim is simply a restatement of her age discrimination claim rather than a separate cause of action.

In addition, for the same reasons she cannot show that she was qualified for the job for purposes of her age discrimination claim, the plaintiff cannot establish that she was qualified for the position for purposes of her *prima facie* case of disability discrimination either.

For all these reasons, Electrolux is entitled to summary judgment on Jenkins' TDA claim.

## C.    Retaliation in Violation of the ADEA

Jenkins alleges that Electrolux retaliated against her for filing her July EEOC charge, in violation of the ADEA. Although she has not expressly conceded this claim, she also does not address it in her Response in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 36). In the Sixth Circuit, a plaintiff who fails to address a claim in response to a motion for summary judgment is deemed to have abandoned the claim. *Briggs v. Univ. of Detroit-Mercy*, 611 F. App'x 865, 870 (6th Cir. 2015).

Nonetheless, a district court may not use a party's failure to respond as a reason for granting summary judgment "without first examining all the materials properly before it under Rule 56(c)." *Briggs*, 611 F. App'x at 870 (quoting *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 630 (6th Cir. 2014)). This is so because "[a] party is never required to respond to a motion for summary judgment in order to prevail since the burden of establishing the nonexistence of a material factual dispute always rests with the movant." *Id.* Thus, "even where a motion for summary judgment is unopposed (in whole or in part), a district court must review carefully the portions of the record submitted by the moving party to determine whether a genuine dispute of material fact exists." *Id.* The court has examined the record and finds no material factual disputes.

To establish a *prima facie* case of ADEA retaliation in the absence of direct evidence, a plaintiff must show that (1) she engaged in a protected activity; (2) the defendant had knowledge of her protected conduct; (3) the plaintiff suffered a materially adverse action of the type that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (citation and

quotation marks omitted); and (4) there was a causal connection between the protected activity and the adverse employment action. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008).

As with a discrimination suit, if the plaintiff establishes her *prima facie* case of retaliation, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for its actions. *See Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008). If the defendant can produce a legitimate, nondiscriminatory reason for its actions, the burden of production shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason offered by the defendant was a pretext designed to mask retaliation. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

In this case, the plaintiff engaged in a protected activity when she filed her first EEOC charge on July 30, 2014; Electrolux learned of her protected activity by August 11, 2014; and Jenkins suffered a materially adverse action when her employment was terminated on September 5, 2014. The question is whether the facts in the record show the existence of a genuine factual dispute as to causation. "But for" causation, the degree of causation required for an ADEA retaliation claim, exists where "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

Electrolux points out that Jenkins conceded, in her response to the defendant's Statement of Undisputed Facts, that "the only fact to support her [retaliation] claim is that she was discharged a little over a month after she filed the [EEOC] charge." (Doc. No. 36-1, at ¶ 93.) Electrolux argues that the temporal proximity between the filing of the EEOC charge and Jenkins' termination, standing alone, is not sufficient to give rise to an inference of causation.

The Sixth Circuit has held that,

> [w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Mickey*, 516 F.3d at 525. In this case, there is temporal proximity, but it is not "acutely close" or "immediate." *See* Mickey, 516 F.3d at 523. Other evidence of retaliatory conduct is therefore required to establish causation.

By her own admission, Jenkins has no such evidence. Moreover, she was 60 days into a 90-day PIP when she filed her EEOC charge, and Electrolux was well on the path to firing her by the time it learned of her protected activity. Before the EEOC charge had been received by Electrolux, Terzo had sent an email to the HR Director and Manager on August 8, 2014, recommending that Jenkins be terminated unless HR could transfer her to an alternative position within the plant. (Doc. No. 30-20, August 8, 2014 email). At the August 15, 2014 PIP meeting, Terzo offered Jenkins the possibility of transfer, but she declined without asking what type of jobs might be available. These circumstances, rather than supporting the plaintiff's claim, further preclude any possible inference of causation. *Accord Beard v. AAA of Mich.*, 593 F. App'x 447, 451 (6th Cir. 2014) (affirming directed verdict for the defendant on the plaintiff's retaliation claim, noting that "[a]n employee cannot allege discrimination like a protective amulet when faced with the possibility that his preexisting disciplinary problems could lead to his termination. Likewise, an employer is not bound to cease all investigation of an employee merely because the employee alleges discrimination."); *see also Mallory v. Noble Corr. Inst.*, 45 F. App'x 463, 473 (6th Cir. 2002) (rejecting plaintiff's claim that the temporal proximity between protected activity

and adverse action was sufficiently close to support an inference of causation; noting that "a reason for inferring a causal connection from retaliation that occurs very shortly after a protected Title VII activity is that in such a short period of time little other than the protected activity could motivate the retaliation" and reasoning that, in such circumstances, an inference of causation could safely be presumed).

Finally, even if the short length of time between protected activity and adverse action alone might give rise to a material factual dispute on the element of causation, Jenkins cannot show that Electrolux's proffered legitimate, nondiscriminatory reason for its actions is pretextual, as discussed above.

Electrolux is entitled to summary judgment on this claim as well.

## V.     CONCLUSION

For the reasons set forth herein, the court will grant the defendant's Motion for Summary Judgment. An appropriate order is filed herewith.


_____
ALETA A. TRAUGER
United States District Judge